# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1897.

---

ALEXANDER T. McGILL, ORDINARY.

---

ANNIE CLAFFEY

*v.*

MARY LEDWITH.

[Filed October 19th, 1897.]

1. A testator will be deemed to have had capacity to make a will if it clearly appears that he comprehended his property, the natural objects of his bounty, the character of the business in which he was engaged, and the disposition he resolved to make of his property when he gave instructions for the will, and when he executed it, though it appears that at the period when the will was made he was in an incipient stage of a fixed mental disease, which at times had so affected him as to incapacitate him from making a will.

2. Where the proof of undue influence was so strong as to cast upon the proponents of a will the burden of showing that such influence had not been

exerted, such burden was not sustained by the opinions of the subscribing witnesses that the testator had not been influenced, and the fact that the testator, during the months covered by the process of will-making, had echoed the arguments of the favored heirs for partially disinheriting a proper object of his bounty, where the favored heirs did not testify and explain their participation in the production of the will, and deny the exertion of undue influence.

3. Upon the facts established in this case - *Held*, that the burden is thrown upon the proponents to show that undue influence was not exerted.

On appeal from a decree of the Bergen county orphans court.

*Mr. James F. Minturn* (with whom was *Michael J. Kelly, Esq.*, of New York), for the appellant.

*Mr. Milton Demarest* (with whom was *Thomas F. Magner, Esq.*, of New York), for the respondent.

THE ORDINARY.

James Ledwith died in the township of Saddle River, in Bergen county, on the 9th of July, 1894, at the age of eighty-four years, leaving a paper, which was executed as his will on the 15th of May, 1890, the validity of which is the subject of the present contest. His wife died many years ago. He had three children—a son, James, who died in Brooklyn, New York, on the 13th of January, 1890, leaving a wife and two children, one of whom was born after his death, and died within a few months after its birth, and two daughters—Julia, who, after a lingering illness, died of consumption in July, 1892, and Annie, who married one Claffey, from whom, during the time in question in this controversy, she was separated.

In early life Mr. Ledwith lived in New York City, and was there engaged in the business of selling liquors, from which, and through economy, he amassed enough money to enable him to own two tenement-houses, built upon a single city lot, fronting upon East Twelfth street, near Avenue A, in New York City, to buy a few building lots at Saddle River, and to purchase and stock a small farm, which lies partly in Bergen county, in this state, and partly in Rockland county, New York,

upon which he lived from 1868 until his death in 1894. The dwelling-house upon the farm is in New Jersey, and hence his legal residence at his death was in Bergen county. The proofs indicate that his yearly income was in the neighborhood of $2,500, and that his estate was worth something approximating $40,000.

The disputed will contemplates this disposition of his estate: The payment of his debts, a bequest of $1,000, charged upon his entire estate, to his brother Thomas and his two daughters, who are the executor and executrices, in trust, to be divided into as many parts as there shall be children of his son James, and invested and paid to those children respectively upon their reaching twenty-one years of age, together with accumulations of interest, the mother of the children to take the $1,000 in case they should all die before reaching twenty-one years of age, and the gift of the residue of his estate to his two daughters, or to the survivor of them, at distribution, and should they both predecease him, to "their heirs or next of kin." Power to sell land is given to the executor and executrices. Prior to the residuary clause of the will, provision is made that the daughters shall have the right to continue to "use and keep" the farm so long as they or either of them shall continue to live on the place.

The will was proved *ex parte* before the surrogate of Bergen county, and admitted to probate on the 10th of July, 1894. On the 24th of September in the same year an appeal was taken to the orphans court by Mary Ledwith, as the guardian of her infant son, Vincent Ledwith, who was the surviving son of the testator's deceased son James, and thereupon such proceedings were had that in 1896 it was decreed that the paper admitted to probate by the surrogate was not the will of James Ledwith, and that the order of the surrogate admitting it to probate be reversed. The matter is now heard upon appeal from such decree of the orphans court upon voluminous proofs taken in that court. The appellant is the testator's daughter, Annie, and the respondent is his daughter-in-law, Mary, widow of the deceased son, in her capacity as guardian of her infant son, Vincent.

Claffey *v.* Ledwith.

The insistence upon which the contest is based, primarily, is, that at the time of the execution of the will James Ledwith, suffering from *senile dementia,* lacked capacity to make a will, and, in that condition, had the disputed paper imposed upon him by his daughters, his brother and the subscribing witnesses; and, secondarily, is, that even if the proofs should be held to be insufficient to establish incapacity to make a will under favorable circumstances, they at least exhibit an intellect so far enfeebled as to present a fit subject for the imposition which the proofs establish ; and, thirdly, is, that if actual fraud by imposition be not shown, the proofs warrant the rejection of the will as a product of undue influence.

It is admitted that prior to his death in 1894 Mr. Ledwith completely, or almost completely, lost his mind. It is not disputed that he suffered from *senile dementia.* The inquiry through the evidence has been as to the stage the disease had reached when instructions for the will were given and the instrument was executed.

The respondent here and appellant in the orphans court insists that she noticed a change in Mr. Ledwith as early as 1886. Charles H. Armstrong and William Kruse testify that in June, 1886, Mr. Ledwith came to their houses, some eight miles from his home, and insisted, first at one and then at the other, that he lived there, and, being refused admission, that he remained in the neighborhood all the night and was taken by them to the poorhouse the next morning. They attribute his conduct to mental derangement. In the fall of the same year William W. Oldfield, a restaurant keeper of Spring Valley, says that Mr. Ledwith got off a train of cars from New York and was so bewildered that he started to go home the wrong way. The witness attempted to send him home, but failed to do so, and, as a result, he was again taken to the poor-house. Mr. Oldfield entertains the opinion that Mr. Ledwith was not under the influence of intoxicants, but, for the time, was mentally deranged.

George Saarosy, a merchant of Spring Valley, and Peter J. Christopher, a near neighbor of Mr. Ledwith, both witnesses for the respondent, testify that in 1887 Mr. Ledwith was in posses-

sion of his mental faculties. Jennie Gillespie, on the contrary, who had frequent opportunity to see Mr. Ledwith, thinks that his mind was giving way in 1887, and John Christopher,·a son of Peter J. Christopher, expresses the same opinion. In support of his opinion John Christopher gives an instance which appeared to him to indicate mental impairment in 1887 or 1888. He, then being seventeen years old, drove Mr. Ledwith to Spring Valley, and there, among other things, stopped at an express office to get a bundle for Mr. Ledwith. He says that he got out and tried to get the bundle from the express agent, but, because the agent did not know him, he was sent out to bring Mr. Ledwith in the office. He tried to induce the old man to get out of the wagon, but failed, whereupon the express agent came out and saw Mr. Ledwith, who got out of the wagon and went into the express office. There the agent wanted him to sign his name in a book, and upon Mr. Ledwith saying that he could not do so, the agent asked him to make his mark, and the old man took up a pen and made a cross in the place indicated by the agent. It seems to be well doubted whether the instance, instead of supporting young Christopher's opinion, does not evince intelligence in Mr. Ledwith. The old man would not obey the boy's direction to get out of the wagon, but when the agent came and he saw the necessity of it, he went into the office. When he was asked to sign his name, he shrank from a task which he had rarely performed, taking refuge in a falsehood, and when told to make his mark, with an intelligence which exhibited an appreciation of that which was required, took a pen and made the cross which is usually adopted for a mark.

As to the year 1888, the respondent testifies that Mr. Ledwith then exhibited mental enfeeblement by carrying about brush, pieces of wood and other things from place to place uselessly and apparently without object. Mr. Saarosy remembers that then Mr. Ledwith inanely, as it seemed to him, would repeat "aye, aye" in reply to questions, and that in the summer of that year he saw Mr. Ledwith making his way barefooted through underbrush and briars. Peter J. Christopher says that after harvest in that year Mr. Ledwith occupied himself in the aim-

less transfer of things from place to place, as the respondent says she noted the year before, and Jennie Gillespie, with some uncertainty as to the time, corroborates him in this particular, and recollects also that Mr. Ledwith was then continually watched as though a child by his daughters, and that she, at the instance of the daughters, took him to the village of Spring Valley to be shaved.

The respondent testifies that in the summer of 1889 she saw Mr. Ledwith wear a fur cap on the hottest days and two or three vests at once, and heard him express fear that the vests would be stolen, and also that she saw him put eggs in his pocket and aimlessly carry things from place to place, and that he then wandered away from home without knowing where he was going. Emma Christopher testifies that upon an occasion in 1889 she saw Mr. Ledwith come in his house and, after walking about restlessly, take a cushion from a chair and throw it on the floor and after looking at the chair throw it also upon the floor, and then throw a shawl and some papers off a lounge and go to the water-pail, evidently to throw that also upon the floor, when his daughter Julia called out to him, "You crazy old fool, let that be;" also that she then saw him go to the fireplace and take a clock from the mantel and put it on the stove, and then dip his hands in some pots of cream behind the stove, and saw his daughter wash his hands and heard her say, "He is a crazy fool." She further says that the day after this, while she was churning at his house, he put rotten apples in the churn. She further testifies that in the same year, apparently unconscious of the impropriety of his conduct, he used the floor of his house in answer to the calls of nature. The father of this witness states that upon two or three occasions in 1889 the old man was so far demented that he failed to remove his clothing when he relieved his bowels.

Speaking of the year 1889, Peter S. Van Orden, a witness for the appellant, says that several times as he drove past Mr. Ledwith's place, and stopped for a short time with the old man, he failed to notice anything irrational in his conduct or speech. To the same effect a Mr. Tallman, who was postmaster at Spring

Claffey *v.* Ledwith.

Valley, says that during the years 1889, 1890 and 1891 Mr. Ledwith was in the habit of coming to the post-office, a distance of three miles, sometimes alone, for his mail, and during those years would call the witness correctly by name and ask for his mail, and otherwise so conduct himself as to impress the witness that he was in possession of his mental faculties.   Another witness, James Crouter, instances that in April, 1889, he was engaged to build a garden fence at Mr. Ledwith's, and when the lumber with which he was to do the work was brought it proved to be hemlock, and Mr. Ledwith refused to permit it to be used, insisting that it should be pine.   The witness says that Mr. Ledwith was right, and he consequently had the lumber changed.   At the same time the witness was called upon to fix the hinges of a cellar door, and explained that he could not do the work because the hinges should be leaded into the stone on one side, whereupon Mr. Ledwith suggested a plan for securing the hinges, which was adopted and proved successful.   During this work the witness says that he ate with Mr. Ledwith, and from time to time talked with him, and was satisfied that he was intelligent.   This witness remembers, also, that in the year 1890 Mr. Ledwith called him correctly by his name, and appeared to him to be in possession of his mental faculties.

It is remembered that Mr. Ledwith's son died in Brooklyn on the 13th of January, 1890.   He was buried on the 16th of the same month.   The funeral was at Brooklyn.   The proofs show that Mr. Ledwith and Mrs. Claffey went to the funeral, leaving home on the 15th so that they might be at the wake that night.   They reached Brooklyn at two or three in the afternoon, and later went to New York to Mr. Ledwith's property in East Twelfth street,   There they visited Margaret Keenan, the janitress of the houses, and took supper with her.   Mrs. Keenan says they came at seven o'clock in the evening; that she expressed sympathy for Mr. Ledwith in the loss of his son, and that he replied that he knew her feeling; that he inquired for her husband and son ; that he ate supper, but did not talk much until her husband came, and that he then talked with her husband ; that when he went away he told her not to give ·

any of the rents she should collect to his son's wife. Simon
Keenan corroborates his wife, and says that Mr. Ledwith talked
intelligently with him about some old neighbors. Mary Keenan
corroborates the testimony of her parents. It appears that an
elderly woman named Brown, who had been one of Mr. Led-
with's tenants for some twenty years, was living in the building,
above the rooms of Mrs. Keenan, and that Mr. Ledwith went
alone upstairs to her rooms to see her and knocked at her door,
and, when he was admitted, asked her how she was, remarked
that her room was very warm, asked for her son, naming him,
told her of his son's funeral and invited her to attend it. Mrs.
Brown says that he stood talking intelligently for about fifteen
minutes. She is corroborated by her daughter, who adds that
as she went to raise the window, after Mr. Ledwith's remark
about the warmth of the room, he said, "You are just as stout
as you ever was;" that her mother spoke of the suddenness of
his son's death, and he replied that it was a great blow, that he
had been so encouraged by the physician that he believed his
son would recover. The daughter, as the mother, thought that
Mr. Ledwith was intelligent and in possession of his mental
faculties. At about nine o'clock he started back to Brooklyn
with his daughter and Jennie Gillespie, who had accompanied
them. Mary Keenan went with them to the street car. She
says that the old man suggested the propriety of their standing
upon the lower corner of the street, the proper stopping-place
of a down car. As no car came they walked down a block to
Eleventh street, and in doing so passed a florist, where he sug-
gested they might purchase some flowers for the funeral, but he
was persuaded that it would be more convenient to buy them in
Brooklyn. She says that when the car came he shook hands
with her and said, "We will see you in the morning," and she
replied in the affirmative. The only other witnesses who speak
of the evening of the 15th of January are Jennie Gillespie and
the respondent. Jennie Gillespie says that the old man was very
quiet in going from Spring Valley to Brooklyn, but in return-
ing from New York to Brooklyn at night he acted so eccentri-
cally in the street and car as to attract the attention of the other

Claffey v. Ledwith.

people and give her trouble to quiet him.   The respondent says that during the night in Brooklyn, as Mr. Ledwith sat up, he failed to express grief for the loss of his son, and when some man came in during the night with a silk hat, Mr. Ledwith claimed it as one he had lost years before.

The funeral took place early in the morning of January 16th. Mr. Ledwith attended it in a carriage accompanied by his daughter Annie and James and Jennie Gillespie.   He had breakfast before he went, but during the remainder of the day, and until he got home to his house, three miles from Spring Valley, at night, he was without food.   James Gillespie says that at one place where the parties stopped to drink, the old·man had a glass of hot lemonade, but that that was all.   The night's vigil and the day's starvation exhausted·him.   Both the Gillespies say he did not realize where he was going when he went to the funeral, and that late in the day, while he was still in the carriage, he became violent and tried to break out.   It appears that after he reached home he so acted that one of his daughters said that he was out of his mind.   Later in the evening, after he had his supper, he became more quiet.

For three or four years, before the son died, he took the general management of his father's tenements in New York City.   He deposited the moneys collected from tenants from time to time in bank to the credit of his father.   After the son's death, John Van Benschoten was employed to do this work, and he continued to act as agent until Mrs. Claffey discharged him.   Mr. Van Benschoten appeared as a witness called by the respondent.   He testified that about the 1st day of February, 1890, he called at Mr. Ledwith's to arrange the terms of his employment, and first saw Mr. Ledwith's daughters, the father being outside of the house.   The daughters called their father, and when he came in they asked what percentage upon the collections the witness would charge, and he replied to Mr. Ledwith that the charge would be five per cent., and asked if that would be satisfactory.   The daughters replied in the affirmative, but the father, after waiting for a time, which seemed to the witness long, replied "too much," repeating several times, and then

added, " Well, I hope you'll do your duty." The witness said, " I hope so," and the old man replied, " I hope you'll earn the money." Mr. Van Benschoten further says that after that time he shrank from dealing with Mr. Ledwith because the latter rambled, and he feared they could not reach an understanding. He thought that Mr. Ledwith's mind was not clear. He says, " He was honest, his intention was right, but you couldn't converse with him long enough." He therefore avoided Mr. Ledwith, and all business communications with him. On one or two occasions the old man asked him how he was getting along, and the witness replied to the family generally, and not to Mr. Ledwith. It does not appear that the witness ever attempted to converse with Mr. Ledwith about his business. He frankly states that such an attempt would have been unpleasant to him because of the old man's repetition. Maria Gillespie, who, when she testified, appears to have been employed in the home of the respondent, says that in February, 1890, Mr. Ledwith habitually went about the yard picking up sticks and whatever came in his way, and that along in April, 1890, his daughters would not trust him to go to the village alone; that when he went to be shaved someone was sent with him; that she, the witness, at times accompanied him to the village when he went to be shaved, and would receive the money for the barber from his daughters and give it to the old man when he reached the village. She says that about that time the daughters were in the habit of ordering their father about, and that sometimes he was obedient to their orders, and at other times would not obey them. Ephraim C. Bass testifies that he married Melissa Christopher, a neighbor of the Ledwiths, in January, 1890, and that from the 23d of December, 1889, to the latter part of January, 1890, he lived at the house of his father-in-law. He was then a Western cowboy. He came to the East for the purpose of getting married, and at the end of January returned to the West. He came back to the East again in 1891, and is now a motorman upon an electric railway in Brooklyn. About the time that the younger James Ledwith died, night and morning he did chores about the Ledwith place. He says that Mr. Ledwith

would get up in the morning at nine or ten o'clock, when called by a daughter, and that the daughters would wash and dress him and give him his breakfast; that at times he would go out and wander away and get lost, so that on three occasions in January the witness had to find him and bring him home; that when found on each occasion the old man did not appear to know where he was; that he was unable to do anything properly; that when he attempted to attend to the wants of the cattle he would overfeed them; that at times he had to be taken to attend to the calls of nature or would act as an infant in disregard of his clothing; that he did not take part in the household management; that all bills were paid by his daughters; that at the very first visit of the witness to the house Mr. Ledwith took a hot teakettle from the stove and put it on the mantel, and then picked up the clock and threw it on the floor and broke it, and that his daughter Annie then said, "He is crazy anyhow and don't know what he is doing." John Christopher testifies that in the spring of 1890 he at times did chores for the Ledwiths, and that he remembers that Mr. Ledwith would be in bed at eight and nine o'clock in the morning, and that his daughters would wake him; that in May, 1890, the witness built a fence to keep Mr. Ledwith out of his daughter's flower garden, because he would unconsciously trample down the flower beds; that the old man was accustomed then to wander aimlessly about without being able to do anything useful, and that in June, 1890, the witness remembers that the old man soiled his clothing in answer to a call of nature without apparently understanding what he had done.

The Rev. Charles Mull, a priest, testifies that he saw Mr. Ledwith ten or twelve times between the latter part of the year 1889 and May, 1890, and that he thought that Mr. Ledwith was then in his second childhood; that he was not irrational, but, as a child, did childish acts without fully understanding, and yet, at the same time, had power of reason; that he would answer some questions correctly, especially those which called upon his memory of long-past events, but would have difficulty with questions concerning present matters, understanding about as a child would. Melissa Bass relates the putting of the teakettle on the mantel,

which was testified to by her husband, but does not corroborate her husband as to the clock. While her husband says that Mr. Ledwith threw down the clock and broke it, she says that, at another time from the putting of the teakettle on the mantelpiece, Mr. Ledwith was going to break the clock, but it was taken from him. She gives an instance of the old man soiling himself, as stated by her husband and her brother, John Christopher, and says that in the spring of 1890 he would, at times, use the washbasin and water-bucket as he would a bedroom chamber. She says that at that time he had to be constantly watched, because of his mental irresponsibility, to keep him from being harmed and doing harm. Peter J. Christopher gives testimony similar to that of his children.

The respondent testifies that Mr. Ledwith ceased to manage his New York property in 1886 or 1887, and that at that time his son took charge of it, and that thereafter Mr. Ledwith did not attend to it; that in February, 1890, she visited him, and saw him, without apparent purpose, tearing up some almanacs and a colored picture; that she did not then meet and converse with him, because his daughters would not permit her to do so; that she did not see him again until the fall of 1890. Dr. Henry C. Neer, who was the physician in attendance upon Julia Ledwith in 1890, testifies that prior to the execution of the will he had made about forty visits to his patient, and that during them he frequently saw Mr. Ledwith; that on the 16th of May, the day after the will was executed, at the instance of Mr. Ledwith's daughters, he specially conversed with the old man with a view to ascertain his competency to make a will; that he talked with Mr. Ledwith and was satisfied that he was competent, and thereupon, at the suggestion of the daughters, made an entry in his memorandum-book, which is this: "May 16th, 1890.. Am requested to make memorandum that James Ledwith made his will yesterday and his mind is good and he is competent to transact any business;" that he cannot recall the entire conversation with Mr. Ledwith at the time stated, but does remember that the old man asked him if he lived where he formerly did, to which the doctor replied that he did—at Park Ridge—and Mr.

Claffey v. Ledwith.

Ledwith replied that he remembered the place, and then described the road leading to it from the main road to Hackensack, and said he had frequently driven past it when he was going to Hackensack; that he also talked intelligently about a slight ailment, for which the doctor then treated him. Mark Dewsnap, a neighbor, testifies that he saw Mr. Ledwith after the death of his son, and that Mr. Ledwith said that he did not like the family his son was married in, and did not wish his property squandered in it. The witness did not notice that Mr. Ledwith changed mentally until after the daughter Julia died in 1892. Stephen H. Burr, a merchant of Spring Valley, with whom Mr. Ledwith dealt, remembered that shortly after the death of his son Mr. Ledwith was in the store and Mr. Burr spoke to him about his son's death, to which Mr. Ledwith replied that he did not expect the young man to go before he did. Frederick P. Van Riper, a neighboring farmer, testifies that he saw Mr. Ledwith shortly after his son's death, and the old man then said that his son had died of pneumonia and had been sick only a few days. The witness thought that Mr. Ledwith was intelligent in his conversation. The testimony of Mr. Tallman, the postmaster at Spring Valley, is, as already stated, that during the year 1890 Mr. Ledwith would come for his mail, and Nelson May, the blacksmith, states that during 1890 Mr. Ledwith came to him from time to time to have work done and conversed intelligently. He specially instances a visit by Mr. Ledwith to him in 1891, when Mr. Ledwith came to him alone on horseback to have the horse shod and an iron bolt mended, and gave his instructions clearly and remained more than an hour, until the work was done, talking intelligently. Dr. James A. Dingman says that upon one occasion in 1889 or 1890 Mr. Ledwith came to his office and talked incoherently and irrationally, so that the doctor, thinking him to be drunk, took him home; but that after that, for a period of three months, he prescribed for Mr. Ledwith to cure an ailment, during which period Mr. Ledwith used to call at his office, and that then Mr. Ledwith paid him in cash, and then acted and talked as one mentally competent. John P. Kuhl says that late in 1889, or in January or February, 1890,

he met Mr. Ledwith driving alone looking for the home of Mr. Debann, the tax collector. He asked the witness to direct him, saying that he wanted to pay his taxes. He said that his son was dead and that his daughter was sick and so he had to attend to the payment himself; that he would know the place if he had driven upon the other road.

It will not be necessary to follow with particularity the testimony as to Mr. Ledwith's mental condition after the will was made. It will suffice to say of it that the witnesses decidedly vary in their impressions of his condition and in their narration of incidents illustrative of his rational and irrational conduct until the time of Julia's death in 1892, after which time the majority of them assert that his mental condition would not admit of his transacting business.

It is apparent, I think, from the references I have made to the testimony, that if credit be given to all the witnesses, Mr. Ledwith, during the year 1890, and possibly earlier, was at times incompetent to transact business, and at other times had sufficient possession of his mental faculties to enable him to intelligently comprehend all that was needful in making a will. The majority of the witnesses who came in frequent contact with him express the opinion that in the period when the will was made he lacked capacity to transact business, but they fail to satisfy me by clear detail of circumstances of the correctness of their conclusion. There are many little indefinable actions in one who is incompetent that are difficult for witnesses to explain or communicate distinctly in their testimony. For this reason the opinions of those who are constantly in company with the subject of the inquiry are permitted to be given in evidence, but the weight of an opinion must depend upon the facts which the witness narrates to sustain it, his opportunities of observation and his intelligence and freedom from bias. *Waddington* v. *Buzby, 18 Stew. Eq. 173, 174.* As has been seen in the incident related by John Christopher, concerning Mr. Ledwith's conduct at the express office, the fact rather tends to overthrow than to support his opinion.

The greater number of opinions of witnesses against the com-

Claffey v. Ledwith.

petency of Mr. Ledwith come from five members of the Christopher family and three members of the Gillespie family and the respondent. The head of the Christopher family is a farmer who worked part of Mr. Ledwith's lands upon shares, but since the management of the property has come into the daughter's hands has ceased to be so employed. From his own statement he appears to also be a pettifogger and promoter of litigation. He says that he has pushed cases to the supreme court in his state. It is claimed that he zealously espouses the cause of the respondent, and that it is a just inference from the attitude of his family as witnesses, that he is promoting the litigation in this case. As to the Gillespie family, it is shown that at the time the testimony was taken, one member of it was employed by the respondent's mother in the respondent's home. Other witnesses, on both sides, have been subjected to criticism on the score of interest or bias of some kind. I think that interest or bias sufficient to wholly destroy credibility has not been shown in the case of any witness, yet in many instances enough has appeared to warp the judgment of the witness and weaken my confidence in the conclusion he or she has expressed. Making allowance, where I think it should be made, for exaggeration due to ignorance, lack of appreciation, and the zeal of interest, I conclude, as I have stated, that Mr. Ledwith was sometimes incompetent and other times competent to make a will.

In this situation it becomes manifest that the greatest attention must be directed to the proofs of Mr. Ledwith's condition at the very times when instructions were given for the preparation of the will and the instrument was executed.

The subscribing witnesses to the will are William H. Kelly, a lawyer of New York City, whom, I infer, from the fact that he is called "Judge" and "ex-Judge," at one time held a judicial position, and John J. Murray, also of New York, a nephew of Mr. Ledwith's deceased wife.

The proofs show that in January, 1890, shortly after the death of the younger James Ledwith, at the instance of Annie Claffey, who wrote to Mr. Murray that her father wished to make a will, Murray called upon Mr. Kelly and told him what

was wanted and asked him to visit Mr. Ledwith.   Mr. Kelly delayed the visit until late in February, and then he and Murray went together to Spring Valley to see Mr. Ledwith.   Mr. Kelly says that when he entered the house he found the old man and his two daughters together.   Murray introduced him, and then he and Mr. Ledwith conversed first about Kelly's mother and family, and then Mr. Ledwith introduced the subject of the church with which they had formerly been connected in New York and its pastor.   After some conversation of this kind Mr. Kelly asked Mr. Ledwith what property he had, and Mr. Ledwith replied that he had a farm situated principally in Bergen county, in this state, but partly in New York; that he owned two tenement-houses on one lot in New York City; that he had some money in bank, and the stock and farming utensils on the place where he resided; that his son had married, and had recently died in Brooklyn, where he lived; that his two daughters lived with him, and that he desired to leave his property principally to his daughters.   Mr. Kelly states that he remembers the substance of what Mr. Ledwith said, but not his precise language, and that part of the information he obtained was in the shape of answers to his questions, and part was volunteered by Mr. Ledwith.   His visit was some two or three hours long, and during it the conversation was principally about the will; that Mr. Ledwith was his chief entertainer; that they walked out and looked at the place; that Mr. Ledwith's instructions were "very clear;" that there may have been suggestions by the daughters in course of them—at least the daughters joined in the conversation in which they were given—but that Mr. Ledwith did not acquiesce in that which his daughters may have said.   He says: "He was a very stubborn man, and he was the boss.   He was very firm.   *   *   *   He was a man who would not let anybody have much to say about his property." This impression the witness received in the two or three hours' interview, for he had not seen Mr. Ledwith before.   He adds that he did not have difficulty in drawing Mr. Ledwith out; that Mr. Ledwith was "perfectly clear, perfectly intelligent and very firm."   The witness made a memorandum of the instruc-

tions, but at the time of his examination had been unable to find it.   He returned to New York to prepare the will.

A second visit he made alone, some six weeks or two months after the first.   During the interval between the first and second visits, Mrs. Claffey called at his office in New York and said that she was in New York shopping, and that her father had asked her to call upon him ; that her father was a little annoyed by the delay and would like to have the will completed.   He says that he has no recollection of Mrs. Claffey speaking of the provisions of the will ; that at any rate he would not have taken directions from her.   He says that at the second visit he again met the father and the two daughters, and read to Mr. Ledwith that which he had prepared, and discussed it with him, and that modifications were suggested by Mr. Ledwith.   He says that the daughters took part in the conversations, dwelling upon the desired provision as to their occupancy of the farm, and that the father finally said that he thought it best to let them have the farm as long as either of them cared, and then to have it sold. The witness adds: " He didn't seem to want to bind them to continue all their lives on the farm, and yet he thought it was a good place for them to live."   There was also, he says, discussion as to the propriety of making the $1,000 for his son's children payable in installments, and some figuring in respect to that.   Outside the matter of the will the witness says that he talked with the old man as to past events, adding " I found him at that time to be quite entertaining."   This interview, like the former, was two or three hours long.   The witness took notes of his instructions at this visit, but has not been able to find them.   He went back to New York and redrafted the will, and on the 15th of May, 1890, with Murray, went to Mr. Ledwith again.   In addition to Mr. Ledwith and his daughters, Thomas Ledwith, the brother of the testator, was present.   Mr. Kelly read the will carefully in the presence of those there, and then handed it to Mr. Ledwith, who asked for pen and ink and a sheet of paper to practice, wrote his name two or three times upon the sheet of paper and then signed the will.   The will was then duly declared and duly signed by the witnesses, Kelly

and Murray. Mr. Kelly says that before the execution of the document he walked out with Mr. Ledwith, so as to be away from the others, and asked him if the $1,000 was all he wanted to leave his son's children, and the old man said "yes," and the witness said, "Is your mind fixed on that?" to which Mr. Ledwith replied, "positively," adding that he did not want his son's wife to spend his hard-earned money; that his son's wife was extravagant.

The subscribing witness Murray states that at both his visits he found Mr. Ledwith to be in possession of his mental faculties. He relates conversations to show the correctness of his conclusion. He corroborates Mr. Kelly as to the circumstances surrounding the execution of the will, and among them the private conversation Mr. Kelly had with Mr. Ledwith outside the house. His account is this:

"The Judge [meaning Kelly] says, 'Now, Mr. Ledwith, are you still wishing to give that $1,000 to the child?' He says, 'Yes.' I think the Judge proceeded with him a little while and he asked him a second and a third time. He says, 'I will make no change. It will be $1,000' * * * I made one remark, 'Why not give him the son's share?' There was no reply to it. Mr. Kelly said, 'Do you think that is enough, Mr. Ledwith?' I think he said, 'That is enough,' and I think he also said about his money, he earned it hard. He made that remark regarding the $1,000—he earned the money hard and didn't want it to be spent foolishly; something of that kind."

Thomas Ledwith also testifies that he saw his brother sign the will. Mrs. Claffey, the only other surviving person present, was not sworn as a witness.

If these witnesses tell the whole truth, and I do not perceive sufficient ground for disbelieving them, though I am constrained to think that Mr. Kelly's testimony may in some respects be exaggerated, there can be no doubt that when the testator gave instructions for the will, and when he executed it, he possessed ample capacity to make it. He comprehended his property, the natural objects of his bounty, the character of the business in which he was engaged, and the disposition he resolved to make of his property. His capacity, I think, was equal to the task he was called upon to perform. *Waddington* v. *Buzby, supra.*

But it is insisted that the will was imposed upon the testator. The subscribing witnesses reiterate with emphasis that Mr. Ledwith fully understood what he was doing, possessed ample ability to care for himself, and exhibited determination to have his own way. Mr. Kelly declares that he was the "boss;" that he was "very firm;" that "he was a man who would not let anybody have much to say about his property," and Mr. Murray gives, as an instance of his resolution, his reply to Mr. Kelly's importunity as to the amount to be given to the grandchildren: "I will make no change. It will be $1,000." It is impossible, if this is believed, to hold that Mr. Ledwith was the subject of imposition.

Let us look at the other proofs submitted in this connection.

John Van Benschoten says that about the 3d or 4th of February, 1890, having a letter written by Mrs. Claffey to Mrs. Keenan which introduced him as the new property agent, he went with the subscribing witness Murray to see Mrs. Keenan and that as he and Murray were coming away, Murray said to him, "I want to stop and see Mr. Kelly, or Judge Kelly, in regard to writing Mr. Ledwith's will. We want to get the old gentleman to make his will. We don't want to let the money go out of the family." Dr. Neer testifies that a few days before the will was executed, Mr. Ledwith's daughters, who were together at the time, asked him if he ever wrote wills, and, upon his replying in the affirmative, asked him if he would write Mr. Ledwith's will, to which he replied to Mrs. Claffey, who was then living at her father's, separate from her husband, that because of complications which might arise out of her relations with her husband, he advised them to employ a lawyer. The doctor thinks that Mr. Ledwith was not present when he was asked to write the will. He said that the daughters did not state what the will was to contain. He says he was then professionally visiting Julia Ledwith. Melissa Bass says that about a week after James Ledwith, Jr., died, his sisters told her that their brother's wife would never get a cent of their money because her mother had spent her father's money. The husband of this witness testifies that he overheard the same conversation.

Claffey v. Ledwith.

He says, " They said that they didn't think she [the respondent] would get any of their father's money to spend, because her mother had spent her father's property, and they didn't think their father would give her any of his money to spend." He says that his wife argued for the child of the deceased brother, and that Julia said that the respondent would not get any of the father's money to spend, " anyway ; " that she need not expect it, to which Annie added, "She won't." Maria Gillespie relates that prior to the first call of Mr. Kelly, in February, 1890, she went to the dining-room door in Mr. Ledwith's house and saw Mr. Ledwith and his daughter Annie standing together by the table in the dining-room, and overheard Annie say to her father that the respondent did not need anything ; that she had enough ; that if she did not have enough to let her work for it, and heard Mr. Ledwith reply " yes " or " aye." She says, also, that at another time Annie said to her (the witness) that the Quinn family was extravagant, and the respondent would be extravagant ; that they were not going to let them spend " their " money ; that the child would be left something, but not his father's share ; that they were going to have their father make a will, and they were sorry he had not done so before, for if he had, trouble in the future would be saved ; that they didn't suppose that the child, Vincent, would live long ; that they thought he was too frail a child to live ; that if he should die his share would go back to the Ledwith family ; that they would be pleased if he would die ; that he would not be brought up properly ; that if he was not there, trouble would be saved. The witness says that at one time she heard Mrs. Claffey say that the respondent was extravagant ; that she (Mrs. Claffey) wanted her brother to come home and live, and that his wife might come or she might stay where she was, as she pleased. It does not appear whether this was said before or after the brother's death. She also says that the daughters told her that their father did not like his son to marry Miss Quinn. She does not say when this was said to her. Jennie Gillespie, the sister of Maria, testifies that before the will was made and while it was under consideration, Mrs. Claffey said to her that her

brother's child, Vincent, would not get his father's share; that they didn't think he was entitled to it; that Vincent's mother would not get anything; that she could work; that she was extravagant; that if she got their money she would use it extravagantly; that they wished that Vincent was dead, for he would cause trouble later on, and that if the will had been made before it would cause less trouble.   The witness also states that about two years after the marriage of the son to the respondent, Mrs. Claffey told her that her father said that he did not like the family into which his son had married.   Peter J. Christopher says that while the will was under consideration, the fact that Mr. Ledwith was making a will was talked about by the neighbors, and that he went to Mr. Ledwith's and there saw the daughter Julia and said to her, "Don't you think that you are doing wrong by robbing your brother's child of that property by making a will?   The old man is not competent, in my judgment, to make a will."   And that Julia replied, "Mrs. Quinn has spent the children's money, and we have made up our minds that Minnie shan't spend ours.   We will look after that child."   Thomas Ledwith says that a month or six weeks before the will was executed he heard a conversation between the daughters and the father, at which the father said that he would leave his grandson $100, and the daughters said that the sum was too small, and the father then said he would give $1,000 to the child and no more.   He said that Mrs. Quinn's family was extravagant, and he did not want to give them money at all. It is remembered that Mark Dewsnap testified that after the son's death Mr. Ledwith told him that he did not wish his money squandered in the family in which the son had married, and that he did not like the family.   It is also noted in the cross-examination of Mrs. Keenan that when Mr. Ledwith told her not to give the respondent any of the rents, he had just been talking to his daughter Annie, who asked Mrs. Keenan to come over to where she and her father stood, and when Mrs. Keenan came, told her father to tell the witness what he wished, for they were in a hurry to go.

It is apparent from this testimony that Mr. Ledwith's daugh-

ters were very decidedly averse to their father making any substantial gift to his daughter-in-law or to her children. They were unwilling that she or her children should have that which they called their brother's share—one-third of their father's property. This unwillingness appears to have grown out of a disapprobation of the character of the family into which the younger James Ledwith had married, rather than out of a cause personal to the respondent, as though prompted by some petty jealousy of the family of the sister-in-law.

Immediately after the son's death the feeling against his wife found vent. Mrs. Keenan was instructed not to give her any of the rents. Whether the idea of this instruction originated with Mr. Ledwith or with Mrs. Claffey does not appear. Mrs. Claffey, at least, aided its communication to Mrs. Keenan. It was a week after the son's death that the daughters told Melissa Bass, first, that they did not think that the father would give the respondent any of his money, and then, that he would not do so. It was later that Murray, acting under a letter of instruction from Mrs. Claffey, declared to Van Benschoten, " ' We' want to get the old gentleman to make a will; 'we' don't want the money to go out of the family;" and it was yet later that Maria Gillespie, through a partially-open door, heard Mrs. Claffey telling her father that the respondent did not need anything; that she had enough, and, if not, to let her work for it, and that the daughters declared to her they would have their father make a will.

It does not appear that the daughters were inimical to the respondent's child. They thought it was a delicate child and would not live. They recognized its claim upon their father's bounty, for Julia told Peter Christopher that they would take care of it. The great burden of their apprehension seems to have been that some of the father's money might go to the Quinn family and there be extravagantly expended.

The testimony shows too much intelligence in Mr. Ledwith when the will was made to admit of much argument to the effect that the document was imposed upon him and executed without his appreciating that it was his will. In holding that there was such an imposition, the honesty and truthfulness of the subscrib-

ing witnesses and Thomas Ledwith must be almost wholly dis-
believed. Such disbelief cannot be justified under the proofs.
Besides, the declaration of Mr. Ledwith to Mark Dewsnap, at
some time during the process of will-making, that he did not
like the family into which the son had married, and did not
wish his money squandered in it, and his reiteration of the same
idea in presence of his brother when he substituted $1,000 for
$100 as the amount of the bequest to his grandchildren, exhibit
that he knew what he was doing.

There exist, however, *indicia* of undue influence, which the
contestants claim should be regarded as sufficiently strong to in-
duce the rejection of the instrument.

This is a summary of them : An intent upon the part of the
daughters to procure just such a will as that made; the author-
ity which their daily presence and ministrations to the comfort
of the old man gave them over him; the mental enfeeblement of
the old man, which made him susceptible to every influence his
daughters, who had his confidence, might exert; their exclusion
of the respondent from an interview with the old man after the
son's death ; their declared determination to have their father
make a will; their instrumentality in procuring a scrivener for
the will; the urgency of Mrs. Claffey's visit to New York to
hurry the scrivener in the performance of his work ; the appeal
to Dr. Neer, while the scrivener delayed, to prepare the will;
the presence of the daughters at, and participation in, every stage
of the preparation and execution of the instrument; the fact that
Mrs. Claffey told her father that the respondent did not need
assistance and should work; the outcome—an instrument which
makes precisely the provision the daughters said it should make,
which gratified their enmity, and gave them, substantially, the
entire estate, and the failure of Mrs. Claffey to submit herself to
examination as a witness and explain her participation in the
production of the will and deny the exertion of undue influence
upon her father.

I cannot avoid the conclusion that these circumstances threw
the burden upon Mrs. Claffey to show that undue influence was
not exerted. *Dale v. Dale, 11 Stew. Eq. 274, 276; Waddington*

v. *Buzby, 16 Stew. Eq. 154, 161, 162.* Their force is not nega-
tived by the opinions of the subscribing witnesses, nor by the
absence of clandestinity at the execution of the will.   Nor is
the burden borne by the showing that, at some time during the
months covered in the process of will-making, the old father
echoed the argument of his daughters, that the respondent's
family were extravagant, and would squander his money.   It
may be that, in his enfeebled state, this argument had been so
constantly kept before him as to take possession of him and
become irresistible and drive out all other considerations.   It is
remembered that for years his daughters had been his constant
companions; that they had managed his business affairs for him,
and had performed the most menial and disgusting offices in
ministering to his comfort; that in every sense he had become
dependent upon them, and that, at this very juncture, they were
vehement in their opposition to the natural claims of the re-
spondent's children.   There could be little doubt that recognition
of these claims in a degree proportionate to the son's distributive
share in his estate, if he should die without a will, would give
serious offence to the daughters.   They had communicated their
wishes to him.   When he came to act, they were present, sup-
ported by their cousin, Murray, who had declared that he and
undisclosed others, constituting the "we" in his declaration,
don't want the money to go out of the family, and the lawyer
called by that cousin.   The atmosphere in which he acted was
apparently filled with influences against an adequate recognition
of his grandchildren.   His meagre proposed award of $100 to
them indicates that its influence upon him was strong—beyond
the wishes of even his daughters.   It was *their* influence which
caused him to raise the sum to $1,000.

I think that under the proofs, left in this condition without
explanation from Mrs. Claffey, the orphans court properly de-
cided against the will on the ground of undue influence.

The decree questions the rightfulness of the allowances made
by the orphans court.   I think that the case was one in which
allowances could lawfully be made.   In amount they appear to

be very liberal; I think sufficiently so to cover all services and expenses of the litigation to this time. I will not make further allowances.

The decree will be affirmed.